STATE of Missouri,
Plaintiff-Respondent,

v.

Marvin R. RICKEY, Jr.,
Defendant-Appellant.

No. 13150.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 29, 1983.

Cenebio Lozano, Jr., Leonard L. Smith, Harrisonville, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Presiding Judge.

Marvin Rickey was charged with the capital murder of L.N. At the opening of his

trial, the state waived the death penalty. A jury found he was guilty. He was sentenced accordingly. He presents three points on appeal.

At about 1:00 a.m. on September 14, 1980 a friend was driving past the home of the victim. He thought the victim was on a vacation. For this reason, when he saw the garage door up, car gone and light on, he stopped to investigate. He saw dried blood on the knob on the door from the garage into the house. Although some lights were on, there was no response to his call. He sought the aid of the police. When they walked into a bedroom, they found the body of the victim. He had been brutally stabbed to death. It is not clear from the record how many wounds he suffered. The pathologist stated each of five wounds would have caused death, one quickly. The attack sliced two ribs in two.

A glass from the victim's home was identified as bearing a fingerprint of Rickey. Rickey was identified as driving the victim's car at a service station 25 miles north of the scene between midnight and 1:00 a.m. On September 15, 1980, the car was found abandoned near Texarkana, Arkansas.

On September 23, 1980, Rickey was in the Cass County jail. At about 2:30 p.m. an investigating officer arrived. He, in the presence of a deputy sheriff, had Rickey read aloud his "rights" and execute an appropriate form of waiver. The deputy sheriff left. The investigating officer asked Rickey if he would talk to Officer Myers who was just outside the room. Rickey said, "I will talk, bring him in." After Myers entered, Rickey asked him, "Well, if I do will I receive the death penalty?" Myers replied, "I did not know for sure, but probably not." During the course of the following six hours, Rickey gave a detailed 20-page handwritten statement. It was written by Myers, read to Rickey, corrected by Rickey and each page signed as correct by Rickey. Rickey's motion to suppress this confession was overruled. Rickey testified and, except as to his intent, related to the jury substantially the same events as contained in the statement. The following is a summary.

Rickey was hitchhiking to Shreveport, Louisiana. He had been drinking. He was picked up by the victim. The victim soon stopped and got a pornographic magazine from the trunk. He invited Rickey to look at it. Rickey glanced at it and threw it in the back seat. Each had a bottle and they had some drinks. The victim invited Rickey to spend the night at his house and Rickey consented. Upon arrival, they fixed drinks. Rickey was shown his bedroom. Soon the victim entered the room removing his pants and asked Rickey if he knew anything about homosexuals. Rickey, in crude language, said he would have none of that and asked to be returned to the highway. The victim pushed Rickey back on the bed and asked him to talk it over. Rickey hit the victim with his fist. Rickey then brandished a hunting knife with a 4-inch blade and told the victim to get out of the way. The victim grabbed Rickey's left arm, causing Rickey to cut his leg with the knife. Rickey superficially cut the victim's chest. The victim again grabbed Rickey and Rickey stabbed him two times. He cut the telephone cord and left. Rickey testified he was mad, scared and afraid. He had no intent to kill or rob the victim.

Rickey's first point is that his confession was improperly admitted because it was made in response to a promise of leniency. Rickey and the state do not disagree concerning the basic law applicable to that point. They cite many of the same cases. It was the burden of the state to prove the admissibility of this in-custody statement. *State v. Haas,* 610 S.W.2d 68 (Mo.App.1980). "[A] confession in order to be admissible must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States,* 168 U.S. 532, 542–543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). Also see *State v. Hughes,* 596 S.W.2d 723 (Mo. banc 1980). "The test for 'voluntariness' is whether the totality of the

circumstances deprived defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed." *State v. Higgins,* 592 S.W.2d 151, 158 (Mo. banc 1979). The application of these principles to the point in question is to some extent subjective. The test has been stated to be whether or not a statement by an officer was reasonably understood by the accused to be an assurance of leniency. *Grades v. Boles,* 398 F.2d 409 (4th Cir.1968).

In considering this point, it is significant that Rickey concedes he was advised of and understood his rights. *State v. Higgins,* supra. The waiver he signed states, "No promises or threats have been made to me and no persuasion or coercion has been used against me."

■ The resolution of this point is dependent upon the meaning that may be reasonably ascribed to, "I did not know for sure, but probably not." No technical rules are needed for the construction of that language. This court holds that within its common sense meaning, there is no way that reply could be reasonably construed as a promise of leniency. Of course, there are no cases dealing with that precise language. However, that language is less subject to a construction of leniency than the following language which has been held not to be an impermissible promise in the following cases: there are no deals but anything that you do tell us, I am sure will be in your favor, *State v. Thomas,* 596 S.W.2d 409 (Mo. banc 1980); if the man is alive, it will help if we can find him, *State v. Huffman,* 607 S.W.2d 702 (Mo.App.1980); it would be made known to responsible authorities that he had cooperated, *United States v. Curtis,* 562 F.2d 1153 (9th Cir.1977); no promises would be made but if he were to cooperate, the United States Attorney and Court would be aware of that fact, *United States v. Springer,* 460 F.2d 1344 (7th Cir.1972). "No public policy should castigate a confession of crime merely because it may have been prompted by the hope that cooperation might achieve or increase the chances of a lenient sentence." *United States v. Springer,* supra, at 1347. Nor is a confession less admissible because it may have been prompted by remorse or braggadocio. The trial court properly overruled Rickey's motion to suppress and admitted the confession. *State v. Chandler,* 605 S.W.2d 100 (Mo. banc 1980); *State v. Flowers,* 592 S.W.2d 167 (Mo. banc 1979).

Rickey's second point is that the trial court erred in not giving an instruction patterned on MAI–CR2d 2.28, Excusable Homicide. Since he did not raise this point in his motion for a new trial, he now presents it as plain error. The principles governing when such failure may constitute plain error are outlined in *State v. Sanders,* 541 S.W.2d 530 (Mo. banc 1976); *State v. Randolph,* 496 S.W.2d 257 (Mo. banc 1973). Former § 559.050 defining excusable homicide was repealed effective January 2, 1979 by the 1977 Criminal Code. Nonetheless, it is declared the law stated therein continues as a part of the common law. Note on Use 1, MAI–CR2d 2.28.

■ The defenses of excusable homicide and justifiable homicide (self-defense) are inconsistent "but are both required to be submitted where supported by the evidence unless defendant's personal testimony is relied upon to support both." *State v. Sanders,* supra, at 533. Also see *State v. Zweifel,* 615 S.W.2d 470 (Mo.App.1981). In this case the only evidence that could be said to support those defenses is the personal testimony of the defendant. An instruction patterned on MAI–CR2d 2.41.1, Justifiable Homicide, was given. The defendant did not object thereto. He utilized that instruction in his closing argument. Since both instructions should not have been given, that should end the matter. But, from the record it does not appear the trial court gave the defendant the election referred to in Note on Use 3, MAI–CR2D 2.28. For this reason, without intimating it is necessary to do so, in the exercise of discretion, this court will review this point.

■ An instruction patterned on MAI–CR2d 2.28 may properly be given only

where it is supported by the evidence. That it is not so supported in this case is patent. The fundamental limitation upon the applicability of the instruction is contained in its opening paragraph. "By 'excusable homicide' is meant the killing of another by *accident* or *misfortune* under the circumstances submitted in this instruction." (Emphasis added.) There is a limit upon the extent to which after the act disclaimers of criminal intent are worthy of recognition. "Where a defendant has used force likely to cause death or great bodily injury, his naked assertion that he did not have the specific purpose to cause death or great bodily harm is not sufficient to require an excusable homicide submission." *State v. Nevels,* 609 S.W.2d 725, 728 (Mo. App.1980). Also see *State v. Shuler,* 486 S.W.2d 505 (Mo.1972); *State v. Crow,* 486 S.W.2d 248 (Mo.1972); *State v. Bevineau,* 460 S.W.2d 683 (Mo.1970).

■ Perhaps recognizing this unsoundness in his position, Rickey advances an equally fallacious position. He asserts he had "the unqualified right to leave." He then argues that to resist his unlawful restraint he had the right "to have used such force as was reasonably necessary to prevent it, irrespective of the existence or degree of physical danger offered or perceived, and further, irrespective of the presence or absence of intention or design of decedent." By this attempted distortion Rickey concludes that when he inflicted five fatal wounds upon the victim, he committed the *lawful act* required to be hypothesized in paragraph 2[2] of MAI–CR2d 2.28.

This is not the law of this state. According to the testimony of Rickey, the victim used force against him by grabbing him. There can be no doubt that Rickey then used deadly force as defined in § 563.011(1). The right to use deadly force against the use of force by another person is governed by statute. The use of such force was a lawful act only if Rickey reasonably believed that such deadly force was necessary to protect himself or another against death, serious physical injury, rape, sodomy or kidnapping. § 563.031.2. The conduct of the victim in grabbing Rickey cannot rise to the level of the applicable definition of kidnapping, that is confinement for a substantial period of time for the purpose of the facilitating the commission of a felony. § 565.-110. If it was any such offense, it constituted false imprisonment, § 565.130. Instruction No. 10, patterned on MAI–CR2d 2.41.1, Justifiable Homicide, was given. It submitted the lawfulness of Rickey's use of deadly force based upon a reasonable belief it was necessary to protect himself from sodomy. That is all to which he was entitled and no error was committed in not instructing upon an excusable homicide.

■ Rickey's last point is that the evidence is insufficient to support the necessary elements of premeditation and deliberation. In urging this point he emphasizes his testimony he was scared and mad. In determining the sufficiency of the evidence, this court is to accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982). The jury was at liberty to disbelieve his exculpatory statements. *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981). This is particularly true in view of such inconsistencies as follows. The total absence in Rickey's 20-page statement of any indication he was scared. His testimony the victim came into the room taking off his pants, when they were fully donned and fastened on the body. His testimony that after he stabbed his victim, "I came back and laid the knife by his body, real easy." No knife was found.

■ A finding of premeditation and deliberation "does not depend upon the time involved as much as it does upon an inference reasonably drawn from the evidence and circumstances surrounding the act." *State v. Wood,* 596 S.W.2d 394, 400 (Mo. banc 1980). Such an inference is supported by the following circumstances. The fact Rickey cut the phone cord to make sure the victim died and the number and severity of the wounds. *State v. Johnson,* 603 S.W.2d 683 (Mo.App.1980).

A finding of premeditation and deliberation can also be based upon Rickey's testimony and admissions. *State v. Wood,* supra. Such a finding is supported by, if not made inevitable by, the following. His admission, "I meant to kill him then, period. I never intended to let him go." His testimony he didn't care where he stabbed him; he didn't say there was no other way out; and that he would do the same thing again. *State v. Wood,* supra. There was ample evidence of deliberation and premeditation. *State v. Davis,* 653 S.W.2d 167 (Mo.1983); *State v. Bolder,* supra; *State v. Ingram,* 607 S.W.2d 438 (Mo.1980). The judgment is affirmed.

HOGAN and PREWITT, JJ., concur.